IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

NORTHERN DISTRICT, SUNBURY, JUNE, 1814.

## Moody's Lessee *versus* Fulmer *et al.*[*]

1. Under the blended jurisdiction of law and equity with which the courts in Pennsylvania are vested, and which governs especially in the action of ejectment, it is often allowable to show the manner in which a defendant in this species of action has come into possession of lands, without reference to the strictly legal effect of the deed; as *exèmp. grat.* that the defendant was no wanton trespasser, but was a purchaser from those who had at least a color of title and who claimed a power of executing a trust; and to show other circumstances making an equitable foundation for the defence. Hence, a deed executed by administrators with the will annexed, was, under circumstances of equity, allowed to be read in evidence irrespective of the legal effect of the power of the administrators to sell; indeed where the court considered that, as administrators, they had no power of this kind at all.

2. An administrator with the will annexed who has made a void deed of lands, and who might perhaps thus be liable to heirs for having pretended to sell what he had no right as such administrator to sell, is a competent witness for the defendant who claims against the heir; he being released by such defendant from liability on his warranty; and his testimony in favor of the defendant, if having any effect on his rights, being only to his own injury.

3. A feme covert plaintiff, through whose heirship in fee the plaintiffs (herself and her husband) derive the title on which the suit is brought, is not a competent witness to discredit the title; the law considering the husband and wife as but one person; and as well for this reason as from motives of policy, not allowing the evidence of the wife's approbation or disapprobation of her husband's doings in bringing suit, to be inquired into in the case.

---

[*] For this case the reporter is indebted to the research and kindness of his learned friend, JOHN WILLIAM WALLACE, Esquire, of Philadelphia, by whom it was prepared.

VOL. I.—2

[Moody's Lessee *v.* Fulmer et.al.]

4. It is no objection to the competency of a witness that he himself holds lands under the same title as the defendant holds those which are the subject of the suit. Provided he has no interest in the very lands which are the subject of the trial, he has no direct interest in the event of the suit, and is therefore competent. The objection is to his credibility alone.

5. Administrators *cum testamento annexo* have no powers as such independently of the act of 12th March, 1800, to execute a power given to *executors* to make sale of the testator's land: the reason being that the testator has placed no confidence in them.

6. Executors to whom a power is given by will to sell lands, but who have all renounced the executorship, have yet power to execute a valid deed of the land ; and this although they have not only renounced, but have agreed and assisted in the appointment of other persons as administrators *cum testamento annexo*, who are still alive. A power operating upon land is validly and conveniently executed by executors even though they have renounced and have no longer the administration of the personal estate. And in Pennsylvania, as we have no Court of Chancery to *compel* the execution of trusts, it is congenial to the spirit of our law to encourage the *voluntary execution* of them, and to be liberal in the construction of powers to sell for useful purposes.

Before TILGHMAN, C. J., and YEATES and BRACKINRIDGE, Justices.

This was an ejectment, brought in the Court of Common Pleas of Northumberland County, to April term, 1803, to recover possession of a valuable tract of land in that county. The facts of the case were as follows:—

Robert Moody, who had originally owned the land, made his last will and testament on the 11th August, 1778; by which he directed and empowered his executors thereinafter to be named, or any two of them, as the exigencies of his family might require, or as some or any considerable just demand against his estate made necessary, to sell, convey and make over any part or parcels of his lands and real estate. In the conclusion of his will he appointed his wife and two particular friends of his, st., William Maclay and Dr. William Plunket, his executors. He died in 1780.

After making this will, he had a child born ; and the widow, not being acquainted with the law which provided for a child thus situated, but supposing that the child would be cut off by a will made before its birth, and being discontented with provisions that her husband had made in regard to herself, concealed the document, and took out letters of administration as if there had been no will at all.

Intelligence having got abroad of the existence of a will, Mrs. Moody was sent for and questioned about the paper, which she finally produced : and all acts which had been done by the administrators were now set aside; the executors, Mr. Maclay and Dr. Plunket, being considerably displeased by the widow's disingenuous and improper conduct.

After what had thus happened, Mr. Maclay and Dr. Plunket

[Moody's Lessee *v.* Fulmer et al.]

declined to meddle with the estate, and were unwilling that the widow should do so either.   Accordingly all parties *renounced the executorship;* Mr. Maclay on the 26th March, 1785; Dr. Plunket on the 28th May following, and the widow on the same day: she in her renunciation consenting to the grant of letters of administration *c. t. a.* to the three persons hereafter mentioned, and whom the other two executors as hereinafter stated had selected to succeed them.   The renunciation of all parties was in writing, and the instrument of renunciation was given to the Register of the county, John Simpson, Esq., and filed in his office.   Though thus themselves renouncing the executorship, Mr. Maclay and Dr. Plunket, who were warmly attached to the deceased and felt an interest in his children— of whom he had left four of quite tender years—still determined that the estate should go into proper hands, *and accordingly procured three other friends of theirs*—st., Robert Robb, John McPherson, and David Ireland, who were also friends of the deceased testator—*to assume the duties of the administration.* And it having been understood that on the renunciation of the executors, the new persons would at once assume the office of administrators with the will annexed, all parties, the renouncing executors, and the new administrators *c. t. a.* met by appointment at the Register's office, where probate of the will, the renunciation of the executors and the swearing in of the administrators with the will annexed, were officially performed at one time.   Messrs. Robb, McPherson, and Ireland, who on the 28th May, 1785, thus assumed the administration *c. t. a.* did so by the particular and urgent request of the executors, Dr. Plunket urging "that he was old and blind and could not take it in hand;" Mr. Maclay being "much abroad," and the widow "insisting hard" that these should take it in hand.

*The administrators gave no security,* such as is required by the act of 1713 relating to administrations.   They proceeded, however, to sell the land, and did sell and convey it; acting, as it appeared, *under authority and as agents of these same executors who had renounced,* and who subsequently approved of what they did.   Moody's children at this time were all minors and young.   The money raised by the sale was necessary to their support, and it was all faithfully applied.   The defendants entered under their deeds into possession, and made improvements; and the lands in virtue of these and otherwise between 1790 or thereabouts, when the defendants entered into possession, and 1803, when this suit was brought, had become valuable.   The plaintiffs, accordingly, while bringing suit, tendered on the trial to the defendants the sum of $2000 to be applied to the reimbursement of principal and interest; and further they agreed to pay the value of all permanent im-

[Moody's Lessee *v.* Fulmer et al.]

provements, deducting the profits received by the defendants
—such value to be ascertained by arbitrators, or otherwise,
under the direction of the court; and execution on the judg-
ment to be obtained in this suit, to be stayed till full payment
should be made of the sum found due from them on the prin-
ciples aforesaid.

In the course of the trial, which was at great length before
CHAMPMAN, President Judge, and where the matters both of law
and evidence were argued ably much at length (the property
in the present suit having been valuable, and there being other
suits depending in which the same questions were involved as
were to be considered in this case), the following questions
arose :—

1. Whether the grant of the letters of administration was
void for want of security? If so, whether the certificate of
the Register, under his official seal, that no security had been
given was evidence of that fact? Whether, supposing the
letters good, Robb, McPherson, and Ireland—the administrators
*cum testamento annexo*—had power to sell as administrators
*c. t. a.?*

*The court below was of opinion that the letters of adminis-
tration gave no authority, and, in fact, were void, from the circum-
stance that security was not shown to have been given.*

2. Whether McPherson, *one of the administrators,* and who
had made a deed with a warranty of good title as against
Moody's heirs, the present plaintiffs, was a competent witness to
prove the title good as against them; Fulmer, the defendant
and purchaser, having released him in form from the obligation
of his warranty to him.

*The court below had received the witness as competent..*

3. Whether Ireland, another of the administrators was so;
the circumstances being the same in his case as in McPherson's.

*The court below had considered him competent.*

4. Whether the declaration of a certain Lucy Hood—a
daughter and heir of Moody, the testator, and the wife of John
Hood, one of the plaintiffs in the suit, his wife being joined
with him—that she disapproved of this suit, &c., could be given
in evidence.

*The court below had received evidence of her declarations, notwith-
standing her coverture.*

5. Whether a certain John Vandyke was a competent wit-
ness for the defendant, and to disprove the plaintiffs' case;
Vandyke himself having purchased from Robb, McPherson,
and Ireland, and his title being the same as that of the defend-
ant's; but he not having any interest in the very land which
was the subject of the present ejectment.

[Moody's Lessee *v.* Fulmer et al.]

*The court below had considered the witness as competent and received his testimony.*

6. Whether various deeds from the administrators *c. t. a.* could be given in evidence, to show, not a legal title under them in the defendants, " but to show in what situation the defendants stood with relation to the original vendees, to put the whole of the circumstances of the case before the court and jury, and so to show generally a want of equity in the plaintiff's case."

*The court below, considering the case one not for the application of the most technical rules of law, admitted all these deeds in evidence.*

7. Whether the executors named in the will of Robert Moody—st., Mr. Maclay, Dr. Plunket, and the widow Moody—had a right to sell his land by virtue of the power contained in his will, after they had all renounced in the manner above stated and after letters of administration had been granted to Robb, McPherson, and Ireland, as administrators *c. t. a.*, who were still alive, and actually acting in their offices.

*The court below decided that the executors had power to sell after they renounced, if they chose so to do; and that they might employ agents to help them.*

The jury having found a verdict for the defendants, the above seven questions came for final decision to this court; the first six on the plaintiff's exception to the admission of evidence, and the seventh—the one, namely, as to the power of executors to convey under a will after they had all renounced the executorship, and when administrators *c. t. a.* were actually by the request and action of the executors themselves, in office, and acting—on an exception to the judge's charge generally.

*Watts,* for the plaintiff in error.

1. The letters of administration *c. t. a.* were improperly allowed to be read. The act of 1713 (1 State Laws, 99) is explicit that registers " *shall,* upon their granting letters of administration, *take bonds with two or more sufficient sureties.*" The certificate of the register under his official seal, and testifying as to an official act, is evidence, and shows that the prerequisites of a grant of letters of administration were not complied with. Even if the letters were good, a deed made by Robb, McPherson, and Ireland, as administrators *c. t. a.*, passes nothing; for the power was given to the executors, and, independently of statute—of which none at that time existed—did not pass to administrators *c. t. a.* So notorious is this position, and so great were the inconveniences of the law, that in 1800 the legislature interfered, and by the act of 12th March, 1800

(3 Smith, 433), caused such powers to survive and pass to administrators with the will annexed. The act was, however, too late to help this case.

2. McPherson, one of the so-called administrators *c. t. a.*, was offered to support a title which he himself had made with warranty against Moody's heirs. This was irregular; for though released by Fulmer, his vendee and the defendant, from liability under his covenants to him, he was still liable to Moody's heirs for selling their land without giving security. A sale without security given, made him an executor *de son tort*, merely.

3. Equally objectionable, and for the same reasons exactly, was the admission of Ireland, another of the so-called administrators *c. t. a.*

4. The declarations of Lucy Hood—she being a *feme covert*—to show that she was satisfied with what Robb, McPherson, and Ireland, the administrators *c. t. a.*, had done, and disapproved of a suit brought by her husband, were plainly inadmissible. Her declaration was not about any act done by herself before marriage, but about an act done now, and by her husband. Even her *deed*, renouncing her right to the land in dispute, would be inadmissible. This evidence might have great effect on the feelings of the jury, and was intended to have it. The fact that one of the heirs, though a *feme covert*, declared her satisfaction with the sale, and her regret that a suit was brought to disturb it, may have been the sole cause of the verdict for the defendants. It was a most dangerous kind of evidence. A *feme covert* has no existence but in her husband, and to bring her declarations in to disparage her husband's conduct, and to make void his acts, is not only indecorous and unallowable on grounds of policy; but illegal on those principles of common law which fix the wife's capacity to act independently of her husband.

5. The exception founded on this fifth head, must perhaps, in law, be relinquished. Yet nothing can be more objectionable than allowing a party to sustain for his neighbor a *title* which he himself is just as much, and perhaps greatly more, interested in proving good, than that neighbor himself. Vandyke, the witness, holds *his* lands under exactly the same title as Fulmer, the defendant. Vandyke proves Fulmer's title good, and when sued himself, as he will be, he will call on Fulmer to return the service. Vandyke swears for Fulmer, and Fulmer swears for Vandyke, and each swears for himself.

6. The deeds from Robb, McPherson, and Ireland, so far as they acted as administrators with the will annexed, were properly considered by the president judge as void. Certainly, therefore, he should not have allowed them to be given in evi-

[Moody's Lessee v. Fulmer et al.]

dence. They gave no title. By what rules of law were they admitted?

7. We agree, that executors, vested *nominatim*, with power to sell, may renounce the executorship, and yet execute the trust of *selling the estate*. But the case is different when the power is given to them *as executors*, which is the case in this will. Here, it will be observed, that not only had the executors renounced, but by their instance and act, three other persons had been appointed administrators with the will annexed. Their renunciation had thus been accepted in the most complete and effective way; they had renounced: their renunciation had been accepted: the place had been vacated, and being vacant, was now filled by new occupants. Admitting that a simple renunciation filed in the office or delivered to the register, would be insufficient to destroy the validity of a deed made by the original executors, *no one having as yet displaced them*, the case is widely different when other persons are *in* the place. Then surely *they* must be out of it. Bacon's Abridgment (vol. 2, p. 405, tit. Executors and Administrators, 9), says: "If an executor refuse before the ordinary, the ordinary may grant administration *cum testamento* to another person, and he can never be permitted to prove the will." In *Yates* v. *Crompton*, 2 Peere Williams, 308, and administrator *d. b. n.* filed a bill against the heir to sell, the executor having renounced. It was objected that the executor ought to have been made a party. But the sale was decreed.

[TILGHMAN, C. J.—" *Tamen quære*," says Mr. Coxe in his note to this case; the point to which Mr. Coxe's *quære* applies, being whether the executor ought not to have been a party.]

In the case before us, the power to sell was to be exercised, by the terms of the will, *as the exigencies of the testator's family should require.* Whether the exigencies of the family did require the exercise of the power, was a matter to be judged of by the actual and acting administrators, and not by persons who had, in fact, been unwilling to meddle with the estate, and had in form refused to touch it; one of whom was "getting old and blind, and could not take it in hand;" another being "much abroad;" and a third, the widow, a person who had grossly abused her office, and been, in fact, displaced for misconduct.

*Duncan* and *Hall* for the defendants.

1. The certificate of the register, even under seal, was no evidence of the non-entry of security. The matter should have been proved by the register himself, and in a regular way. The point is, however, unimportant, since the act of 1713, relied on to show that administration *c. t. a.* is void, unless

[Moody's Lessee *v.* Fulmer et al.]

bond is given, applies only to administration in case of intes-
tacy.    Even if bond were necessary here, the administrators
*c. t. a.* had a *color of authority*, which was sufficient to protect
strangers.    *Rex* v. *Lisle*, Andrews, 166 ; Coke Lit. 58 b., note
5.    [The counsel then went into a history of the statute law of
Pennsylvania, endeavoring to prove that prior to the statute of
12th March, 1800 (3 Smith, 433), mentioned on the other side,
administrators *c. t. a.* succeeded to such powers of sale as were
given to executors ; especially where their object in making
sale was to pay debts: contending that if this were not so, then
" there had been a defect in the law for a hundred years."]

2 and 3.   McPherson and Ireland were both competent wit-
nesses, because their interest, created by their warranty to
Fulmer, was removed by Fulmer's release.    After that the only
interest they had was to testify *against* themselves ; which they
had a *right* to do ; though a right commonly exercised by men
with reluctance, or not at all.

4.   Lucy Hood was a party to the suit, one of Moody's chil-
dren, and the owner—if the defendants were not—of the land
in controversy.    No better evidence could have been given of
the want of equity of the claim, than that a person most inter-
ested to sustain it, declared that in her opinion it was unjust.

5.   The point raised in the fifth head is abandoned.    Certainly
it cannot be sustained.    Vandyke had no interest in the ver-
dict, whatever he had in the question.    He was undoubtedly
competent ; and all objection was to his credibility.

6.   The deeds here in question related to the subject in dis-
pute.    We stand here in the same position as if we had filed a
bill in equity, in which case we might show everything tending
to explain our situation and show the fairness of our conduct.

7.   By well settled principles of the common law, the execu-
tors had just as full power to exercise their power of sale after
their renunciation as before it.    The renunciation to the Regis-
ter or ordinary relates simply to personalty ; the only sort of
estate over which either has any power whatever.    The power
to sell is given by the *will*, and might be exercised without
any probate of it at all ; *Yates* v. *Crompton*, cited on the other
side, is in our favor.    The objection was that " the executors
ought to have been made parties, for notwithstanding they had
renounced, yet the power of sale continued in them."    The
objection was overruled, " there being *only* a power and no
ESTATE devised."    To say nothing of Mr. Coxe's Quære, more
valuable than one of Lord *King's* decisions, in this case and
under our Pennsylvania law, the executors *were* vested with an
*estate*.    So that the case is one in point for us.    So too what
Bacon says is true only by the civil law, but whether or not,
it has no application here ; for the executors don't ask to

resume.  Swinburne on Wills (vol. 2, p. 731, ed. of 1803), an old but authoritative book, says: "If a man devises that A. B. and C. D., whom he makes his executors, shall sell his lands, and they refuse to be his executors, yet nevertheless they may sell because they are *named* by their proper names."  For this he cites Fulbecke, an old but good writer.  Here the power was to his executors hereafter to be *named*, and three particular persons are afterwards "named."  Indeed the authorities go much further.  Viner (vol. 8, p. 466, pl. 9) says one wills that his executors may alien his land *without* naming them.  The executors named refuse to be executors; yet they may alien.  This law is not only well settled now, but it has been settled from a very ancient date.  It was expressly so decided by all the judges of England in Trinity Term, in the 16th year of Henry VII., and is reported in the Year Book of that reign.  The Judges who gave opinions were Fineux, Chief Justice, and Read, Tremaille and Frowick, Justices.*

The original language of the Year Book is thus:—

" Tarde fuit adjudge en l'Eschiquier Chambr. par Touts les Justicces d'Angl 9. si on fait volonte de sa tt. 9. ses exec. vend la tt. et alien, &c., si les executors refusent l'administac. et destre executors, or les administrators ni l'Ordinarie ne peuvent vendre, ni alienere.  Quod Nota.  Quod fuit concessum p. Rede & Tremaille pour bone ley.

" Et si on fait volonte, que ses executors alien sa tt.  Sans nomer leurs propres noms, silz refusent l'administrac. et d'estre executors, uncore ilz peuvent alien la tt.  Quod fuit concessum p. Fineux & Tremaille p. clere ley, Rede non dedixit.

" Et si on fait volonte q. sa tt., q ses feffees ont sera vendue et alien et ne dit par qui, or les executors alien c et nemy les feffees; p. Rede, Tremaille & Frowic.  Fineux disoit rien a ceo a c'est jour, mes le jour avat il in man. affirm ceo.  Conisby dit q. les feffees alien c; car ils ont l'confidence mis en eux. mes c fait denie; car executors ont plus de confidence mis in eux q ont les feffees."

This case is thus literally and accurately translated by Mr. Sugden in his work on Powers, Appendix.

" It was lately adjudged in the Exchequer Chamber, by ALL THE JUDGES OF ENGLAND, that if a man makes a will of lands, that his executors shall sell the land and alien, &c., if the executors renounce administration and to be executors, there

---

* Interesting biographical sketches of all these early English Judges may be seen in Mr. Foss's "Lives of the Judges of England."  Fineux was appointed a Judge of the C. P., Feb. 11, 1494 (9 Henry VII.) and " gave so much satisfaction in that office," says Foss, "that in less than two years he was promoted to the office of C. J. of the K. B.  He died in that high office, in 1525, with an unblemished reputation both as a lawyer and a man."

[Moody's Lessee *v.* Fulmer et al.]

neither the administrators nor the ordinary can sell or alien (*quod nota*); which was allowed by Rede and Tremaille for good law.

" And if a man makes his will that his executors shall alien his land without naming their proper names, if they refuse the administration and to be executors, yet they may alien the land, which was admitted by Fineux, C. J., and Tremaille, J., for *clear* law ; Rede, J., not denying it.

" And if a man makes his will that his land which his *feoffees* have, shall be sold and aliened, and does not say by whom, there 'his executors shall alien that, and not the feoffees, per Rede, Tremaille, and Frowic, JJ.; Fineux, C. J., said nothing to this, this day, but the day before he in a manner affirmed this. Conisby, J., said that the feoffees shall alien; but this [fact] was denied, for executors have much greater confidence in them than feoffees have."

This case, which comes from the highest source of the common law—the Year Books—declared, in A.D. 1500, what the law was then. It is cited in 17th Henry VII., two years after its decision, in Keilwey's Reports, 44 b; and approved because the power is derived from the will and not from the ordinary or register. It has since been received as an exposition of law, all along. The case in the Year Book is specially valuable as showing the immense confidence reposed by the law in those persons whom a man selects to be the executors of his last will and testament. It declares—

I. That if the executor renounces, neither the administrator *c. t. a.*, nor the ordinary, can execute powers which the testator gave to *him*.

II. That though the executors have renounced their executorship, yet that *they* may still execute a deed which the testator gave them power to execute, even though in giving them the power, it was to them as executors, and not to them by name or as individuals: and this point, which is the point before us, C. J. Fineux and Tremaine, J., admitted for " *clear* law," Justice Rede not denying it.

III. That where a man, in his last will, gives power to sell his lands, not saying by whom the power shall be exercised, it shall be *intended* that he meant that his executor should exercise it, and that accordingly they can; while his feoffees cannot.

Here is our point fully, clearly and precisely stated, between three and four hundred years ago, as being " clear law" in 'that day. It was reported at once; printed soon after, with the invention of printing, and has stood and been cited from that time to this, as an authoritative decision.*

* See Sugden on Powers, vol. 1, p. 139 (15 and 16 L. L.,), and Preston on Abstracts, vol. 2, p. 264. Sugden says : " It remains only to observe, that

The opinion of the court was delivered by

TILGHMAN, C. J.—This ejectment was brought by James Moody and others, children of Robert Moody, deceased, for the recovery of a tract of land, of which their father died seized in fee simple. Robert Moody, the father, made a will, of which he appointed his wife Abigail, Wm. Maclay and Dr. Wm. Plunket, executors, and authorized them, or any two of them, to sell his land, or such parts thereof as might be necessary for the payment of his debts and support of his family. The executors all renounced, and administration *c. t. a.*, was committed to Robert Robb, John McPherson, and David Ireland. A sale of the land in dispute was made by these administrators, who executed a deed for the same, containing a warranty against themselves and their heirs, and the heirs of the said Robert Moody. The proceeds of sale were faithfully applied according to the directions of the will, and the defendant, who has been long in possession, has made valuable improvements. The plaintiffs, apprehending, that although their father's land had been unlawfully sold, yet as his estate had received the benefit of the purchase money, it would be unjust to turn off the purchaser without full compensation, brought $2,000 into court, to be applied to the reimbursement of principal and interest; and further, they agreed to pay the value of all permanent improvements, deducting the profits received by the defendant—such value to be ascertained by arbitration, or otherwise, under the direction of the court; and execution on the judgment to be obtained in this suit, to be stayed till full payment should be made, of the sum found due from them on the principles aforesaid. This offer of the plaintiffs was made during the trial—in the course of which several exceptions were taken on points of evidence, as well as a general exception to the charge of the court.

1. The first exception was to the letters of administration *c. t. a.* offered by the defendants. This exception was founded on a certificate from the Register of Wills, that the administrators had given no security; the plaintiffs' counsel contending, that by the act of 1713, the letters of administration were void, because no security was given. On the other hand, it was argued by the counsel for the defendant, that the certificate of the register was no proof that security had not been given, and even if it was, that the act of 1713 did not extend to

where the power is given to executors, they may exercise it, although they renounce probate of the will." And Preston: "Although executors renounce the probate of the will as to personal estate; they are not by such renunciation disqualified to execute an authority of sale over real estate." Hood (Treat. on Executors, p. 243) says: "At common law, executors who have formally renounced the administration of a will, may nevertheless execute a power given by will to sell lands."—REP.

administrators *c. t. a.,* but was confined to cases· of *intestacy.* My opinion on this exception, depends on considerations of a more general nature, which will apply to other exceptions afterwards taken in the progress of the cause. The plaintiffs themselves had confessed an equity in the defendant, and, under the blended jurisdiction of law and equity, with which our courts are vested, it is necessary for the court and jury to consider not only the law, but the equity of the case. Now, in order to explain the defendant's case, it was important to show the manner in which he came into possession—that he was no wanton trespasser, but a purchaser from those who had at least *a fair color of lawful authority*—that he had paid full value for the land, and his money had been so applied as to be of essential service to the plaintiffs, and a complete fulfilment of their father's will. It was proper, therefore, to establish the foundation of his defence, by showing that his title was derived from persons who claimed the power of executing the trust in Robert Moody's will, by virtue of letters of administration *c. t. a.* What was the legal effect of those letters, would be a different question. The defendant might have a strong equity, although the administrators had no legal right to sell. I am therefore· of opinion, that the letters of administration were properly received as evidence.

2. The defendant next offered John McPherson, one of the administrators, as a witness, having first produced a deed of release from John Fulmer, under whom the defendant claims. He was objected to, on the ground of interest, but the Court of Common Pleas overruled the objection, and admitted him. Before he received the release from Fulmer, he was interested, because of the warranty in the deed from Moody's administrators, to which he was a party. But the release removed this objection. If he was any otherwise interested, it was ·because he was liable to an action under the act of assembly of 1713, for having undertaken to act as an administrator without giving security. In this point of view, if the plaintiffs lose their land, he will be liable to their action for damages. It is his interest, therefore, that the plaintiffs should recover; so that when he comes forward as a witness *against* them, he is to swear *against his own interest,* ·which it is competent for him to do, if he pleases, although he could not be compelled to it. I am therefore of opinion that he was a good witness.

3. The next exception was to the competency of David Ireland, another witness offered by the defendant. The objection to this witness being precisely the same as that to McPherson, I shall barely say that, in my opinion, he was competent.

4. The defendant then offered evidence of declarations by Lucy Hood, wife of John Hood, and one of the children of

Robert Moody. Both husband and wife are plaintiffs in this suit. The plaintiffs objected to this evidence, but the court admitted it. Husband and wife are considered as *one person* in law, and, from motives of *policy*, are not permitted to testify for, or against, each other. It is not on account of *interest* only that they are excluded, but in order to prevent family harmony from being broken. If either of those persons should give testimony in open court affecting the character or the interest of the other, deadly feuds might be the consequence, and as the law protects the husband from his wife's testimony in court, so does it likewise from her declarations or confessions out of court. She can have no will of her own—she can exercise no right over *her own property* without his consent. Her *deed*, under hand and seal, would be no evidence—much less then should her verbal declarations be. Her husband had a right to make use of her name, as a plaintiff in this action; and her approbation or disapprobation was a matter not proper to be given in evidence. Whether the jury paid any regard to the evidence, it is impossible for us to say; nor have we any right to conjecture. The only question is, was it legal evidence? For the reasons which I have given, I am of opinion that it was not.

5. The fifth exception, which was to the admission of John Vandyke, a witness produced by the defendant, was very properly relinquished. Vandyke holds land under the same title as the defendant, but has no direct interest in the event of this suit. The objection, therefore, went only to his credibility.

6. The sixth exception was to the admission of sundry deeds, by which title was derived from Moody's administrators to the defendant. My opinion here is governed by the principles laid down in considering the first exception. The defendant had a right to show every circumstance connected with his coming to the title or possession of the land, because his title was greater or less, according to the circumstances. It was proper, therefore, that the court and jury should hear them.

The exception to the judge's charge remains to be considered, which may be reduced to one point, viz: Whether the executors named in the will of Robert Moody had a right to sell his lands by virtue of the power contained in his will, after they had all renounced, and administration *c. t. a.* had been committed to others. It was the opinion of the judge, that although the administrators had executed a deed of conveyance, yet there was ground for concluding, from the evidence, that they acted in the capacity of agents for the executors, and under their direction. It was his opinion, also, that the executors had power to sell, and he put the cause upon this point, to the jury, for he agreed with the plaintiffs' counsel that the admin-

istrators had no authority of their own, the letters of adminis-
tration being void, for want of security.   As we have no court
of chancery to *compel* the execution of a trust, it is congenial
to the spirit of our law to encourage the *voluntary execution*,
and to be liberal in the construction of powers to sell for useful
purposes.   Nothing could be more useful than the purpose for
which the executors of this will were authorized to sell, viz :
*the maintenance of the family and payment of the debts of the tes-
tator*.   The trust, operating upon *land*, might be very conveni-
ently executed by persons who had not the administration of
the personal estate.   The administrators *c. t. a.* could not sell,
because the testator had placed no confidence in them—there
is an authority expressly to this point in 8 Viner, 465 (P. C.),
pl. 2.   But the executors, although they renounced the admin-
istration, might, without inconsistency, execute the trust re-
specting the land.   For this also there is express authority :·
Swinb. 408 ; 8 Viner, 466 (P. E.) pl. (cites 15 H. 7, 12 b.).   I
have examined the Year Book, and the citation *is* correct.
Upon the strength of these authorities, I am of opinion that
the executors had power to sell, after they had renounced the
administration of the personal estate.   In future, there will be
no difficulty in cases of this kind, the power to sell having
been vested in the administrators *c. t. a.* by the act of 12th
Mar. 1800.